UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE WILLIAM PENN LIFE INSURANCE COMPANY
OF NEW YORK,

                            Plaintiff,

           - against -

KIMBAL VISCUSO, CHARLES M. BIRNS and BETH S.
MARTIN-BIRNS,

                         Defendants.
-------------------------------------------------------------------X

**DECLARATION OF
ROBERT B. WEISSMAN**

Docket No.:
08 CIV 1141 (WCC)

      Robert B. Weissman hereby declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

      1.   I am an associate of Saretsky Katz Dranoff & Glass, L.L.P., attorneys for defendants Charles M. Birns and Beth S. Martin-Birns ("the Birns defendants") and as such, I am fully familiar with the facts and circumstances set forth herein. I submit this declaration in response to plaintiff's motion to deposit the interpleader funds with the Court and in opposition to defendant Kimbal Viscuso's motion for dismissal or, alternatively, summary judgment.

      2.   Annexed hereto, and made part and parcel of this motion to dismiss, please find the Birns defendants' Memorandum of Law.

      3.   In addition, annexed hereto, and made part and parcel of this motion to dismiss, please find the following exhibits:

      Exhibit A:    An October 13, 2006 Beneficiary Change Form executed by Michael Birns;

Exhibit B:     Plaintiff's Answer to Counterclaims and Counterclaim, dated April 30, 2008;

Exhibit C:     A November 6, 2006 letter from plaintiff to Jon Fieldman;

Exhibit D:     A November 8, 2006 personal check, in the amount of $4,886.00, signed by Michael Birns and made payable to plaintiff;

Exhibit E:     An April 18, 2007 letter from plaintiff to Michael Birns;

Exhibit F:     A copy of this Court's decision in <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente</u>, No. 98 Civ. 1756, 2001 WL 11070 (S.D.N.Y. 2001); and

Exhibit G:     A copy of this Court's decision in <u>Citigroup Global Markets, Inc. v. KLCC Investments, LLC</u>, No. 06 Civ. 5466, 2007 WL 102128 (S.D.N.Y. 2007)

4.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of May, 2008.

_____
Robert B. Weissman (RW 0512)

# EXHIBIT "A"

# BENEFICIARY CHANGE FORM

Mail completed form to:
William Penn Life Insurance Company of New York
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
1-800-346-4773

**William Penn**
Life Insurance Company of New York
...A Partnership for Life

Insured: **Jon Ficidman**    Policy Number: **0700014261**

I.   The proceeds of this life insurance policy will be paid to the beneficiary as shown below. The rights of the beneficiary will be subject to the rights of any assignee of record.

**PRIMARY BENEFICIARY** (If additional space is needed, please attach a separate page.)

| Name (First, MI, Last) | Address (street, city, state, zip) | SSN | Relationship | Percent |
|---|---|---|---|---|
| Charles A. Birns | 17 Hadden Road - Scarsdale NY 10583 | 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 | Son of POA | 50% |
| Beth S. Martin Birns | 17 Hadden Road - Scarsdale NY 10583 | 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 | wife of POA | 50% |
| | | | | |
| | | | | |

☐ I have more than 5 Primary Beneficiaries.    Totals MUST add to 100%    100%

**CONTINGENT BENEFICIARY** (If additional space is needed, please attach a separate page.)
(A contingent beneficiary is a person or persons named to receive the benefits only if the primary beneficiary dies before the insured.)

| Name (First, MI, Last) | Address (street, city, state, zip) | SSN | Relationship | Percent |
|---|---|---|---|---|
| Michael Birns | 17 Hadden Road - Scarsdale NY 10583 | 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 | POA | 100% |
| | | | | |
| | | | | |

☐ I have more than 5 Contingent Beneficiaries.    Totals MUST add to 100%    100%

All prior designations, if any, of beneficiaries and contingent beneficiaries are hereby revoked.

II.   Required Signatures

X _____ - POA    917-969-9802 - 800-842-5440   914-472-1785

Policy Owner Name    Telephone Number

17 Hadden Road    MBirns @ Aol. com.
Address    Email Address

Address

Address

Scarsdale NY 10583    _____ Power of Attorney 10/13/06
City State Zip    Signature of Policy Owner (Required)   Date

Maryetta Saccomanno 10/13/06
Witness Signature (Required) Date    Additional Signature** (if necessary)   Date

**The following states require a spousal signature if you are currently married or were married at the time of purchase: AZ, CA, ID, LA, NV, NM, TX, WA, WI and Puerto Rico. If the spouse is deceased please enclose a copy of the death certificate. If divorced, please enclose a copy of the divorce decree.

III.   To process your request without delay, please make sure the following have been completed:
- ☑ Did the Policy Owner(s) sign and date the form?
- ☑ Do the percentage totals equal 100%?
- ☐ Did you include the spousal signature if applicable?
- ☑ Did the witness sign and date the form and an additional signature if applicable?
- ☑ Did you enclose the title page and signature page of the trust if listed as a beneficiary?
- ☐ If you designated more than 5 primary or contingent beneficiaries, did you attach an additional page?

LP159WP (9/05)

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

THE WILLIAM PENN LIFE INSURANCE
COMPANY OF NEW YORK,

                Plaintiff,

   -against-

KIMBAL VISCUSO, CHARLES M. BIRNS
and BETH S. MARTIN-BIRNS,

                Defendants.

-----------------------------------------------------------------X

**ANSWER TO
COUNTERCLAIMS
AND COUNTERCLAIM**

08 Civ. 1141 (WCC)

**ECF CASE**

Plaintiff, The William Penn Life Insurance Company of New York, by its attorneys, Bleakley Platt & Schmidt, LLP, as its answer to the counterclaims of defendants Charles M. Birns and Beth S. Martin-Birns:

    1.     Denies knowledge or information sufficient to form a belief concerning the allegations contained in paragraphs 25, 29, 32, 33, 35 and 48.

    2.     Denies the allegations contained in paragraph 38, except admits that a letter was sent to Jon Fieldman, dated November 13, 2005, containing the quoted statement.

    3.     Denies the allegations contained in paragraph 42, except admits the receipt of a purported premium payment for the specified period.

    4.     Denies the allegations contained in paragraph 47, except admits that a letter was sent to Michael Birns, dated April 18, 2007, containing the quoted statement.

    5.     Denies the allegations contained in paragraphs 26, 27, 28, 30, 36, 37, 39, 40, 41, 43, 44, 46, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59 and 60.

6.      Repeats and realleges the denials and admissions herein made to the allegations contained in paragraphs 24 and 31.

## AS A FIRST AFFIRMATIVE DEFENSE

7.      The Durable Power of Attorney, dated January 31, 2005, purportedly executed by Jon Fieldman appointing Michael Birns as "Attorney-in-Fact and Agent" provided, in paragraph 17, that it was subject to the laws of the State of Arizona.

8.      Paragraph 1 of this document contained an "Advisory Notice to Agent" that under "Arizona Revised Statute Section 14-5506 . . . an agent cannot receive any benefits from Principal unless those benefits are specifically identified in detail within this instrument or within a written contract.  Otherwise, the agent could be subject to criminal prosecution or subject to the penalty provisions of Arizona Revised Statute Section 46-456, which authorizes the loss of the agent's right to inherit from principal as well as payment of treble damages and attorney fees. An agent should carefully review these statutes or consult with a knowledgeable attorney prior to exercising the authority granted by this Power of Attorney."

9.      It was provided in paragraph 14 of the Durable Power of Attorney that the authority granted to the agent "shall not include the authority to change the name of any beneficiary in any retirement asset or insurance contract."

10.     As the result thereof, Michael Birns lacked the authority to change the beneficiary of the subject policy to his wife and son.

## AS A SECOND AFFIRMATIVE DEFENSE

11.     As the result of the provisions of the Durable Power of Attorney alleged in the First Affirmative Defense, an estoppel against the maintenance of the counterclaims should be applied against Charles M. Birns and Beth S. Martin-Birns who are attempting to assert rights

2

against William Penn based upon acts which were unauthorized and, upon information and belief, illegal under the laws of the State of Arizona applicable to the subject document.

## AS A THIRD AFFIRMATIVE DEFENSE

12.     The acts of William Penn alleged in the counterclaims to have been performed in November 2006 as the result of the submission of a request to change the beneficiary of the subject policy resulted from the mutual mistake of Michael Birns and William Penn concerning the provisions of the Durable Power of Attorney and the authority of Michael Birns to effect a change of beneficiary thereunder.

13.     As the result thereof, defendants are not entitled to any relief on the subject counterclaims.

## AS A FIRST COUNTERCLAIM
## AGAINST DEFENDANTS CHARLES M. BIRNS
## AND BETH S. MARTIN-BIRNS

14.     On or about November 13, 2006, acting pursuant to a Durable Power of Attorney purportedly executed by Jon Fieldman, Michael Birns submitted a Beneficiary Change Form to William Penn requesting that the beneficiary of William Penn policy 0700014261, insuring the life of Jon Fieldman be changed from Kimbal Viscuso to Charles M. Birns and Beth S. Martin-Birns.

15.     The Durable Power of Attorney submitted with the request expressly provided that the authority granted to Michael Birns "shall not include the authority to change the name of any beneficiary in any retirement asset or insurance contract."

16.     Neither William Penn, nor, upon information and belief, Michael Birns were aware of the aforesaid limitation on the authority of Michael Birns and that the Durable Power of Attorney could not be used by Michael Birns for the requested purpose.

3

17.    William Penn and, upon information and belief, Michael Birns believed that the Durable Power of Attorney could be used to change the beneficiary of the subject policy.

18.    As the result of the mutual mistake of William Penn and Michael Birns, the beneficiary of the subject policy was changed by William Penn to Charles M. Birns and Beth S. Martin-Birns.

19.    As the result of the mutual mistake of William Penn and Michael Birns, the terms of the subject policy did not reflect the intent of Jon Fieldman and William Penn that Kimbal Viscuso remain the beneficiary thereof.

20.    William Penn requests that the policy be reformed to indicate that Kimbal Viscuso is the proper beneficiary thereof.

21.    William Penn does not have an adequate remedy at law.

WHEREFORE, plaintiff demands judgment dismissing the counterclaims, together with costs and further demands judgment on the First Counterclaim reforming William Penn life insurance policy 0700014261 to provide that Kimbal Viscuso is the beneficiary thereof, together with such different relief as to this Court may seem just and proper.

Dated: White Plains, New York
       April 30, 2008

BLEAKLEY PLATT & SCHMIDT, LLP

BY: _____
       ROBERT D. MEADE (RM-8324)
       *Attorneys for Plaintiff*
       ONE NORTH LEXINGTON AVENUE
       P.O. BOX 5056
       WHITE PLAINS, NY 10602-5056
       (914) 949-2700

4

TO:    SARETSKY KATZ DRANOFF & GLASS, L.L.P.
*Attorneys for Defendants Charles M. Birns and Beth S. Martin-Birns*
475 PARK AVENUE SOUTH
NEW YORK, NY 10016

M. TREVOR LYONS, ESQ.
CONNELL FOLEY LLP
*Attorneys for Defendant Kimbal Viscuso*
85 LIVINGSTON AVENUE
ROSELAND, NJ 07068-3702

# EXHIBIT "C"



# William Penn
### Life Insurance Company of New York
100 Quentin Roosevelt Boulevard P.O. Box 519
Garden City, New York 11530

November 06, 2006

JON FIELDMAN
8270 E WOOD DRIVE
SCOTTSDALE, AZ 85260

Policy number:            0700014261
Insured:                  JON FIELDMAN

Dear Policyowner:

Thank you for choosing William Penn Life Insurance Company to help with your insurance needs.  Your recent
request to change your policy has been completed.  The enclosed endorsement is a valuable document and
should be attached to your contract.

We are glad to have had this opportunity to be of service.  Should you have any further questions or need
additional information, please do not hesitate to contact our Administrative Services Department at
1-800-346-4773.

Sincerely,


Service Representative
Administrative Services Department


CC:  G630000
     EKA PLANNING SERVICES INC


NEND1

# EXHIBIT "D"

15/10/2007    13:06                                                                NO.946    P02

**MICHAEL BIRNS**
17 HADDEN RD.
SCARSDALE, NY 10583-3323

1-32/210
7365583622

1379

DATE 11/8/06

PAY TO THE
ORDER OF _William Penn_                    $4886.00/100

_Four thousand eight hundred eighty six_ _____ DOLLARS

**Bank of America**
0 700014261
New York
MEMO _Jon Fieldsone_

⑆021000322⑆ 73555 83823⑈ 1379

# EXHIBIT "E"



**William Penn**
Life Insurance Company of New York
...*A Partnership for Life*

100 Quentin Roosevelt Boulevard
P.O. Box 519
Garden City, New York 11530
(516) 794-3700

April 18, 2007

Mr. Michael Birns
17 Hadden Road
Scarsdale, NY 10583

Re:    Jon Fieldman, Deceased
       Policy Number: 0700014261
       Claim Number: LC 04584

Dear Mr. Birns:

We are very sorry to learn of the death of Jon Fieldman.

Please be advised that a review of the above-captioned policy file, revealed that Kimbal Viscuso was the primary beneficiary of record on the application for insurance.

A Beneficiary Change Form was submitted by you as power of attorney and acknowledged. The Durable Power of Attorney does not include the authority to change the name of any beneficiary in any retirement asset or insurance contract. Therefore, Kimbal Viscuso is the current beneficiary of record.

To help us process this claim promptly, please furnish us with the following:

1.    The enclosed Claimant's Statement to be completed by Kimbal Viscuso. Please include the address and social security number.
2.    A certified death certificate indicating the manner of death.
3.    The original policy contract.

Just as soon as we receive the above requested documents, we will be in the position to give this claim our prompt attention.

In the mean time, if you have any questions or we can assist you in any way, please let us know.

Very truly yours,



Barbara Fox
Claims Examiner

Enclosure
cc: G63

*A member of the world-wide Legal & General financial network.*

# EXHIBIT "F"



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))**

**H**
Merrill Lynch, Pierce, Fenner & Smith, Inc. v.
Clemente
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
MERRILL LYNCH, PIERCE, FENNER & SMITH,
INCORPORATED, Plaintiff,
v.
Dr. Floriberta CLEMENTE, Kerkvoogdijraad Van
Molukse Kerken, Cassonic Trade Commerce Lim-
ited, George Lambert, Albert Arnold and Stabili-
mento Infante, Defendants.
**No. 98 Civ. 1756 LMM.**

Jan. 4, 2001.

*MEMORANDUM AND ORDER*

MCKENNA, J.
**\*1** Merrill Lynch, Pierce, Fenner & Smith, Inc.
("Merrill Lynch") brought this interpleader action
pursuant to 28 U.S.C. § 1335(a).[FN1] Merrill Lynch
now moves for summary judgment seeking dis-
charge from liability, dismissal of the counter-
claims asserted against it and reimbursement of
costs and legal fees. Claimant Floriberta Clemente
("Clemente") cross-moves for summary judgment
on her counterclaims against Merrill Lynch.
Claimants Kerkvoogdijraad van Molukse Kerken
("KVMK"), the Ecclesiastical Council of Moluccan
Churches, Cassonic Trade Commerce Ltd.
("Cassonic"), George Lambert and Albert Arnold
("Lambert and Arnold") and Stabilimento Infante
("Stabilimento") (collectively "Hill Group
Claimants") move for summary judgment against
Clemente and Clemente cross-moves for summary
judgment on the question of who is the rightful
owner of the interpleader fund. For the reasons set
forth below, Merrill Lynch's motion is granted in
part and denied in part; Clemente's cross-motion
against Merrill Lynch is denied; Clemente's motion
for summary judgment against the Hill Group

Claimants is denied; and the Hill Group Claimants'
motion for summary judgment is denied.

> FN1. In bringing the interpleader action
> Merrill Lynch relied on Fed.R.Civ.P. 22 as
> an alternative basis for jurisdiction.
> (Cmplt. at 1.) Because the Court finds that
> Merrill Lynch satisfies the requirements of
> § 1335(a), it is unnecessary to proceed un-
> der Rule 22 as well.

Background

On October 10, 1997 Clemente opened an Individu-
al Investor Account ("Clemente Account") through
Merrill Lynch International Bank ("MLIB") in Lon-
don. (Moya Aff. ¶ 5.) Although the Clemente Ac-
count was opened with MLIB, it was maintained by
Merrill Lynch and subject to regulation in New
York. (Moya Aff. ¶ 5.) Between October 1997 and
January 1998 the Clemente Account received
nearly $27 million in wire transfers. (Cmplt.¶¶
13-16.) These funds came from four sources who
now comprise, with Clemente, the claimants to the
interpleader fund: (1) $23,948,939.85 from KVMK,
located in Utrecht, the Netherlands; (2)
$999,985.00 from Cassonic, an entity with a Cay-
man Islands address; (3) $900,000.00 from Lambert
and Arnold, two Tennessee residents; and (4)
$999,985.00 from Stabilimento, an entity with a
Lichtenstein address. (Moya Aff. ¶ 6.)

Each claimant tells a similar tale of how their
money came to be deposited in the Clemente Ac-
count. Cassonic describes a meeting with Helmut
Konig, purportedly the manager of the international
division of Caixa de Credito Agricola de Oeiras
C.R.I. ("Caixa"), a Portugese bank. (Cassonic Stmt.
¶ 6.) Konig offered Cassonic the opportunity to in-
vest in a "high-yield investment program .... run
through RI, whom Konig stated was an integral part
of the Rothschilds banking family."(*Id.*) On
September 14, 1997, Cassonic executed an agree-
ment with Caixa to place one million dollars in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))**

RI investment program, (*id.* ¶ 12; Ex. E.), and on October 16, 1997 transferred the money into what was eventually revealed to be the Clemente Account. (Moya Aff. ¶ 6(i), Ex. B.) Despite the terms of the agreement providing for a guarantee on the money invested and bi-weekly reports, Cassonic received neither. (Cassonic Stmt. ¶ 12.) On March 5 and 16, 1998 Cassonic demanded the money back from Caixa but received no reply. (*Id.* ¶ 13.)It was not until Merrill Lynch served Cassonic with the interpleader complaint that Cassonic learnt that its funds had been deposited in the Clemente Account. (*Id.*)

**\*2** Lambert and Arnold received a letter from LaDonna Rosellini describing a high-yield investment program run by the Rothschilds family. (Lambert & Arnold Stmt. ¶ 6.) Upon agreeing to invest, Lambert and Arnold wired $900,000 dollars into what was later discovered to be the Clemente Account. (*Id.* ¶ 25; Moya Aff. ¶ 6(ii), Ex. C.) Soon after, Lambert and Arnold requested the promised accountings which they never received and on March 1, 1998 demanded their money back. (Lambert & Arnold Stmt. ¶¶ 13-14.) On March 1, 1998 Lambert and Arnold contacted Merrill Lynch and demanded the return of their money. (*Id.* ¶ 15.)

KVMK was introduced to the high yield investment program purportedly run by Rothschild Bank by Fabera AG. (KVMK Stmt. ¶ 15.) Fabera and KVMK entered into an agreement whereby KVMK would invest in the Rothschilds program and Fabera and TTI, allegedly Rothschilds' trading facility, would manage the KVMK's investment. (*Id.* ¶ 15.)Pursuant to a joint venture agreement signed on December 15, 1998, on or about December 17, 1997 KVMK transferred approximately $3.5 million dollars into the Clemente Account to secure participation in the Rothschilds program. (*Id.* ¶ 17; Moya Aff. ¶ 6(iv).) KVMK then entered into a "Trading Agreement" with Fabera, pursuant to which it transferred approximately $20.5 million dollars into the Clemente Account. (KVMK Stmt. ¶ 20; Moya Aff. ¶ 6(v).) After repeatedly requesting a

guarantee for the funds as provided for under the Trading Agreement, KVMK demanded the return of the funds. (KVMK ¶ 22.) KVMK hired an investigator and learned that its funds had been deposited in the Clemente Account. (*Id.* ¶ 23.)

Stabilimento also met with Fabera and was told about the Rothschilds Bank high yield program. (Stabilimento Stmt. ¶¶ 7-8.) On December 11, 1998 Stabilimento entered into a joint venture agreement with Fabera pursuant to which Stabilimento deposited $ 1 million dollars into the Clemente Account. After not receiving the promised guarantee, Stabilimento demanded its money back on March 9, 1998. Stabilimento only learned in whose account its money had been deposited when Merrill Lynch served it with the interpleader complaint. (*Id.* ¶ 18.)

Merrill Lynch was first made aware of possible conflicting claims to the funds deposited in the Clemente Account on or about February 24, 1998 when KVMK's investigator advised Merrill Lynch that he believed Clemente previously had been involved in fraudulent investment schemes. (Moya Aff. ¶ 9.) On February 25, 1998 KVMK sent Merrill Lynch a letter in which it announced its intention to contact the Dutch authorities regarding the fraudulent investment scheme it believed involved the money deposited in the Clemente Account. (Moya Aff. ¶ 10.) On February 27, 1998 KVMK sent Merrill Lynch a letter in which it claimed ownership of the funds it had transferred into the Clemente Account and requested the return of those funds. (Moya Aff. ¶ 11.) On March 2, 1998 Merrill Lynch received a letter from Stephen R. Hill of Hill & Associates, stating that he had been retained by KVMK for the purpose of recovering the funds KVMK transferred into the Clemente Account and instructing Merrill Lynch not to transfer such funds without KVMK's consent. (Moya Aff. ¶ 12.)

**\*3** What role, if any, Clemente played in the fraudulent schemes described above is essentially unknown. All of the Hill Group Claimants assert that they never heard of her until they discovered that their money had been deposited in her account. As

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))

for Clemente, she states that in the past she had dealings with Konig, who defrauded her of "million of dollars" and that "Konig acknowledged his indebtedness to me, and apparently induced the Americans and Cassonic to send money to me in repayment of that indebtedness."(Clemente Aff. ¶ 6.) As for the money transferred to her account from the remaining Hill Group claimants, Clemente only states that "under the terms of the Agreement [between KVMK and Fabera], Clemente's company TTI was meant to have the use of the money for five years."(Clemente Mem. at 7.)

On March 3, 1998 Clemente left a message at MLIB requesting a check payable to her for the entire available balance in the Clemente Account to be ready the following day. (Moya Aff. ¶ 13.) On March 4, 1998 MLIB telephoned Clemente and informed her that in light of KVMK's claim to funds in the Clemente Account, Merrill Lynch was unable to issue the check. (Moya Aff. ¶ 14.) By letter to Clemente dated the same day, MLIB confirmed that it could not remit to her funds from the Clemente Account until the resolution of the competing claims. Further, it informed Clemente that because of the competing claims it had placed the funds in an escrow account and had liquidated the equity holdings in the Account "on the grounds of prudence and our inability to determine investment suitability."(Moya Aff. ¶ 15, Ex. L.) Also on March 4, 1998 Fabera notified Merrill Lynch that it was a joint venture partner with KVMK and claimed Clemente was the beneficial owner of the account. In a separate letter on the same date, Fabera disputed Hill & Associates' authority to act on behalf of Fabera as KVMK's joint venture partner and asked Merrill Lynch not to respond to any more requests from Hill & Associates. (Moya Aff. ¶ 16.) On March 5, 1998 MLIB received a letter from a solicitor, Ian S. Baker of Guy Clapham & Co., purporting to represent Clemente and challenging MLIB's actions with respect to the Clemente Account. (Moya Aff. ¶ 17.)

On March 6, 1998 Modesto Moya ("Moya"), an

employee in Merrill Lynch's Regulatory Affairs Department and involved in the disputes surrounding the Clemente Account, was provided with documents relating to KVMK's claims by Hill. (Moya Aff. ¶ 18.) A few days later, Moya communicated with either Arnold or Lambert regarding the funds they had transferred into the Clemente Account and informed Moya that they had a claim to such funds. (Moya Aff. ¶ 19.) On March 11, 1998 Merrill Lynch filed a complaint for interpleader initiating this action and on March 16, 1998 deposited $25,829.681.80, the funds in the Clemente Account, into the Court's Registry.

### Legal Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Once the moving party establishes a prima facie case demonstrating the absence of a genuine issue of material fact, the non-moving party has the burden of presenting "specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation."*Scotto v. Alemenas,* 143 F.3d 105, 114 (2d Cir.1998).

### Discussion

I. The Hill Group's Motion for Summary Judgment and Clemente's Cross-Motion for Summary Judgment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 4
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))

*4 Both the Hill Group Claimants and Clemente move for summary judgment seeking a determination of who is the owner of the funds from the Clemente Account. Clemente argues that because she is the owner of the Merrill Lynch account in which all of the funds were deposited, she is the owner of the funds. The Hill Group Claimants dispute Clemente's claim, arguing that she is not a bona fide third party titleholder to the funds in the Merrill Lynch account because she did not acquire the funds in good faith and for value. Although both parties allude to choice of law as an undecided question in this case, neither party briefs the question of which jurisdiction's law applies or what that law substantively provides with respect to their claims. Therefore, for the purposes of this motion only, the Court will assume that New York law applies.

The Court does not find that the issue of who is the owner of the funds rests on determining who is the holder of the Merrill Lynch Account. Nor is this a question of standing to bring a claim against Merrill Lynch for the purposes of a forfeiture action. Rather, the issue is whether Clemente received the money in good faith and for value, and the Court finds that questions of fact remain that preclude the entry of summary judgment for either party.

The Hill Group Claimants can recover the funds from Clemente if they establish that she did not receive them "in due course of business and in good faith upon a valid consideration."*Stephens v. Bd. of Educ.,* 79 N.Y. 183, 1879 WL 10864, at *2 (1879). In *Stephens,* Gill wrongfully appropriated $3,600.84 from the Board of Education of the City of Brooklyn ("the Board"). Soon after, Gill forged a mortgage and received $4,129.34 from Stephens, the plaintiff, which he deposited in his bank account. Gill then wrote a check to the Board for the $3,600.84, which cashed the check and used the money. Some time later, Stephens, realizing that the mortgage was a forgery, demanded from the Board the money it had received from Gill. The Board refused to return the money to Stephens, who then filed suit for its return. The Court found for the Board and stated the applicable rule:

The money having been obtained by Gill from the plaintiff [Stephens] by fraud and felony the former acquired no title thereto and the plaintiff could recover it from Gill if found in his possession, or he could follow it into the hands of any person who received it from Gill without consideration or with notice of fraud by which he obtained it.... The rule has been settled by a long line of cases, that money obtained by fraud or felony cannot be followed by the true owner into the hands of one who has received it bona fide and for valuable consideration in due course of business.

*Id.* Here, the facts are similar. The Hill Group Claimants were fraudulently induced by third parties to deposit money into the Clemente Account and now seek the return of the money from Clemente. Thus, the question is whether Clemente acquired the money in good faith and for value. However, without discovery, there are insufficient facts to determine whether Clemente received the money in good faith and for value and the Court therefore denies Clemente and the Hill Group Claimants' motions for summary judgment.

I. Merrill Lynch's Motion for Summary Judgment and Clemente's Cross-Motion for Partial Summary Judgment

*5 Merrill Lynch moves for summary judgment seeking discharge from this action. The ability of the Court to discharge this interpleader action is governed by 28 U.S.C. § 2361, which in turn requires that the stakeholder satisfy the requirements of 28 U.S.C. § 1335(a): "[t]here must be a fund greater than $500; adverse claimants of diverse citizenship; deposit of the fund in court; and a distinterested stakeholder."*Mendez v. Teachers Ins. & Annuity Ass'n & College Ret. Equities Fund,* 982 F.2d 783, 787 (2d Cir.1992).

Here the requirement under the statute that Merrill

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))**

Lynch, as the Plaintiff, be diverse from the Defendants is satisfied. Merrill Lynch is a citizen of New York, Clemente, of Mexico, KVMK, of Netherlands, Cassonic, of Grand Cayman Island, Lambert and Arnold, of Tennessee and Stabilimento, of Liechtenstein. The amount in controversy is approximately $25 million dollars. Merrill Lynch has deposited the fund with the court and claims no interest in the fund save attorney's fees and other costs.

Clemente attacks Merrill Lynch's motion for discharge on a number of grounds and seeks by its cross-motion to find Merrill Lynch liable for its conduct with respect to the funds in the Clemente Account. The counterclaims appear to be for breach of contract, breach of duty of care, conversion and for deprivation of property without due process under 42 U.S.C. § 1983 [FN2] and all appear to arise from the same allegations: Merrill Lynch did not honor Clemente's March 3, 1998 request for a check for the balance in her account (breach of contract, breach of duty of care and conversion); MLIB liquidated the securities held by the account (breach of contract and conversion); Merrill Lynch brought the funds from the Clemente account to the United States (breach of implied covenant of good faith and conversion) and deposited the money with the court without a court order and without providing Clemente with notice and the opportunity to be heard (breach of contract, conversion and denial of due process).

> FN2. Clemente states that there is a claim for breach of fiduciary duty (Clemente Mem. at 10) but the Court could not discern an argument or facts supporting such a claim.

A number of Clemente's claims flow from her primary argument that Merrill Lynch was not faced with "adverse" claims for the purposes of interpleader. Clemente's argument, however, erroneously focuses on the legitimacy of the claims asserted to the fund rather than the legitimacy of Merrill Lynch's belief that it was or would be subject to

multiple liability.

To properly bring an interpleader action, Merrill Lynch as the stakeholder must "legitimately fear[ ] multiple [liability] directed against a single fund, regardless of the merits of the competing claims."*6247 *Atlas Corp. v. Marine Ins. Co.,* 155 F.R.D. 454, 462 (S.D.N.Y.1994) (quoting *John v. Sotheby's,* 141 F.R.D. 29, 33 (S.D.N.Y.1992)); *see also* *Washington Elec. Co-Op v. Paterson, Walke & Pratt, P.C.,* 985 F.2d 677, 679 (2d Cir.1993) ("[W]hat triggers interpleader is 'a real and reasonable fear of double liability or vexatious, conflicting claims.' ") (citation omitted).

*6 Clemente argues that because the various claimants to the fund (other than Clemente herself) alleged claims of fraudulent inducement, they were not in fact asserting claims to the funds in the Clemente Account, and therefore Merrill Lynch had no genuine fear of multiple liability. Clemente's argument appears to be that Clemente, as the holder of a bank account, did not hold title to the money, instead, all she has is a "chose in action." [FN3] Thus, Clemente reasons, a party asserting a claim to the funds in an account must assert a claim to the chose in action, not a claim of fraudulent inducement to pay money into the account. Because the claimants, according to Clemente, only claimed fraud, their claims were not for the funds in the Clemente Account and therefore could not be adverse to her claim. (Clemente Mem. at 14-16.)

> FN3. *See* *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 560 (2d Cir.1976) ("Upon deposit of funds at a bank, the money deposited becomes the property of the depository bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action.").

However, KVMK and Lambert and Arnold did not just make a claim for fraudulent inducement, rather they demanded their share of the funds in the Clemente Account and explained that they had been fraudulently induced to deposit their money in that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.))

account. These two demands plus Clemente's own demand for a check in the amount of the balance of the account clearly constitute conflicting claims. Although it is possible that a claim may be so baseless to preclude a finding of a good faith belief in multiple liability, the claims asserted against Merrill Lynch were "real and not fancied." *Viewhaven, Inc. v. Danon,* 85 Civ. 9603, 1986 WL 6779, at *2-*3 (S.D.N.Y. June 12, 1986) (quoting *Bache Halsey Stuart Shields, Inc. v. Garmaise,* 519 F.Supp. 682 (S.D.N.Y.1981)). KVMK and Lambert and Arnold supported their claim to the funds in the Clemente Account with supporting documents demonstrating the transfer of money from their respective accounts to Clemente's. (Moya Aff. ¶¶ 18-19, Exs. O, P.) Whether they would ultimately prevail on the merits against Clemente was not Merrill Lynch's responsibility to determine. *Viewhaven,* 1986 WL 6779, at *2 ("Moreover, a party is not required to evaluate conflicting claims at his own peril or to rely on assurances by one claimant that another's is without merit.") (citation omitted). Thus, the Court finds that Merrill Lynch was in fact faced with "adverse" claims and properly brought this interpleader action.

Clemente contends that even if the Court finds that Merrill Lynch was faced with adverse claims, Merrill Lynch's conduct is still "actionable" on a number of grounds. However, to the extent Clemente's counterclaims arise from acts taken by Merrill Lynch "within the rights granted to [it] by law in bringing [its] interpleader action," her claims fail as a matter of law. *United States Trust Co. v. Alpert,* 10 F.Supp.2d 290, 293 (S.D.N.Y.1998), *aff'd sub nom.,United States Trust Co. v. Jenner,* 168 F.3d 630 (2d Cir.1999). Therefore, Clemente's claims based on Merrill Lynch's deposit of the fund with the Court cannot be maintained. Clemente claims that Merrill Lynch deposited the funds from her Account without first obtaining a court order, thus preventing Clemente from raising various defenses as well as claims for breach of contract, conversion and denial of due process. (Clemente Mem. at 24-25.) However, § 1335 does not require a court order, thus Merrill Lynch's proper commencement of the interpleader action cannot create liability. *See id.* at 307 (rejecting counterclaim "which turns simply on whether the interpleader plaintiff acted properly in bringing the interpleader action").

*7 Finally, Clemente makes two arguments that are best characterized as claims against Merrill Lynch for breach of the contract governing her account. Clemente asserts that the alleged transport of the funds from England to New York and the sale of the securities in her account prior to its deposit with the Court are "actionable" as conversion. However, Clemente's ability to bring these claims depends on Clemente being determined the rightful owner of the funds. Further, the Statement of Terms and Conditions provided to Clemente upon the opening of her account with Merrill Lynch provides that her money would not be held by Merrill Lynch and that it could be held in the United States. (Basso Aff., Ex. A ¶ 12.) Therefore, even if the money is ultimately determined to be Clemente's, she still would be precluded from bringing the claim, and Merrill Lynch is granted summary judgment as to this claim. However, with respect to the claim arising from the liquidation of securities, both Merrill Lynch and Clemente's summary judgment motions are denied, without prejudice to re-file, if the funds from the Clemente Account are ultimately found to belong to Clemente.

## II. Attorneys' Fees and Costs

In addition to its request for discharge, Merrill Lynch seeks an award of costs and attorney's fees from the funds now on deposit with this Court. Generally, a court will award attorney's fees and costs to a disinterested and innocent stakeholder. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 683 (2d Cir.1989). In *Septembertide,* the Second Circuit stated that a stakeholder may recover fees and costs if the court finds that "(1) the party seeking fees is a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

charge from liability."884 F.2d at 683. Merrill Lynch has met all of the above criteria. It claims absolutely no interest in the funds, it has deposited the entire sum of the escrow account with the Court and has sought discharge through this motion. Accordingly, Merrill Lynch shall submit to the Court no later than twenty days from the date of this Memorandum and Order an affidavit providing a detailed accounting of its attorney's fees and expenses, including a breakdown of time spent by subject matter.

Clemente argues that Merrill Lynch should not be able to recover fees incurred in its defense against her counterclaims because those fees are not incurred in asserting the interpleader cause of action. (Clemente Mem. at 39.) However, to the extent Clemente's counterclaims arose from actions taken by Merrill Lynch as a result of being subject to multiple claims and in commencing the interpleader action, any expenses Merrill Lynch incurred in defending itself against those counterclaims are therefore recoverable.

### Conclusion

Merrill Lynch's motion is granted in part and denied in part; Clemente's cross-motion against Merrill Lynch is denied; Clemente's motion for summary judgment against the Hill Group Claimants is denied; and the Hill Group Claimants' motion for summary judgment is denied.

*8 Merrill Lynch may submit, on three days' notice to the other parties, a proposed order discharging it of liability as to the funds deposited with the Court.

This action and the related forfeiture action, *United States v. $25, 829, 681.80,* 98 Civ. 2682(LMM), are hereby consolidated for the purposes of discovery.

S.D.N.Y.,2001.
Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente
Not Reported in F.Supp.2d, 2001 WL 11070 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "G"

Westlaw.

**Slip Copy**                                                                                                    Page 1
**Slip Copy, 2007 WL 102128 (S.D.N.Y.)**
**(Cite as: 2007 WL 102128 (S.D.N.Y.))**

**C**
Citigroup Global Markets, Inc. v. KLCC Invest-
ments, LLC
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CITIGROUP GLOBAL MARKETS, INC., Inter-
pleader Plaintiff,
v.
KLCC INVESTMENTS, LLC and D and D Trust,
Interpleader Defendants.
KLCC INVESTMENTS, LLC, Counterclaim
Claimant,
v.
CITIGROUP GLOBAL MARKETS, INC., Coun-
terclaim Defendant.
**No. 06 Civ. 5466(LBS).**

Jan. 11, 2007.

John E. Jenkins, Lubiner & Schmidt, Cranford, NJ,
for Interpleader Plaintiff Citigroup Global Markets,
Inc.
Richard M. Resnik and Alexander M. Jeffrey, Jr.,
Seyfarth Shaw LLP, New York, NY, for Interplead-
er Defendant and Counterclaim Claimant KLCC In-
vestments, LLC.
Eugene Killian, Jr., Killian & Salisbury, P.C.,
Clark, NJ, for Interpleader Defendant D and D Trust.

*OPINION AND ORDER*

SAND, J.
*1 Citigroup Global Markets, Inc. (Citigroup) initi-
ated this interpleader action under 28 U.S.C. §§
1335, 1397, and 2361 (2000) to resolve competing
claims by KLCC Investments, LLC and D and D
Trust to a certain securities account maintained at
Citigroup. KLCC filed a counterclaim against Cit-
igroup for breach of contract, breach of good faith,
conversion, and negligence. Before the Court are:
(1) D and D Trust's motion to dismiss for lack of
personal jurisdiction or to abstain in deference to

parallel proceedings in New Jersey state court, (2)
Citigroup's motion for discharge as interpleader
plaintiff and to stay other actions relating to the
property at issue, and (3) KLCC's cross motion for
partial summary judgment dismissing the inter-
pleader action.

I

This case relates to a securities account at Citigroup
that was opened in June 2005 by Solomon Dwek.
The account contains various securities, the bulk of
which consist of stock in four local banks. The cur-
rent value of the assets in the account is approxim-
ately $7 million, but the assets are volatile and illi-
quid. Citigroup asserts that because the shares held
in the account vastly exceed the average daily trad-
ing volume of stock in the four banks, any attempt
to liquidate the assets would drastically decrease
their market value. (Pl.'s Mem. in Supp. of Mot. to
Discharge at 11-13.) Citigroup further asserts that
to maintain the value of the account, the assets must
be actively managed and traded. (*Id.* at 13-14.)The
assets have not been traded since the initiation of
this action and have lost approximately $1 million
in value based on the change in share price since
April 2006. (*Id.* at 14.)Citigroup claims no interest
in the assets.

Shortly after opening the account on June 30, 2005,
Dwek, Citigroup, and Kenneth Cayre (the principal
of KLCC) executed a control agreement granting
KLCC certain rights over the Dwek account. The
control agreement referenced a separate security
agreement in which Dwek granted KLCC a security
interest in the Dwek account as collateral for a loan
from KLCC for Dwek to purchase a certain prop-
erty in Red Bank, New Jersey pursuant to a separ-
ate    profit    participation    agreement.[FN1]KLCC
claims that these agreements gave it a perfected se-
curity interest in the Dwek account.

FN1. There is a dispute as to whether this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

debt was ever actually incurred by Dwek in a manner that would give KLCC a valid security interest in the Dwek account. The profit participation agreement (PPA) provided that KLCC would lend Dwek $14 million on July 18, 2005 to buy 54 Broad Street in Red Bank, New Jersey with the sale to close the same day. Dwek was to pay back the $14 million on September 30, 2005 plus two thirds of the profit from the contracted sale of the property to a third party for $19 million. Citigroup asserts that this transaction never took place as public records show that the real property in question never changed hands; therefore there was no underlying debt to create the basis for Dwek's pledge. KLCC claims that it advanced the $14 million to Dwek, but the real estate transaction never occurred, creating a default condition entitling KLCC to demand the assets in the Dwek account. KLCC submitted documents to support its contention, but the dates are inconsistent and the documents fail to give a clear picture of what transpired. KLCC submitted documentation showing that on July 18, 2005, $14 million was transferred, not from a KLCC account, but from Cayre's personal account to a Dwek-controlled entity pursuant to the PPA and a pledge and security agreement executed that same day. (Cayre Reply Decl. ¶¶ 6-8, Ex. CC.) The control agreement executed on June 30, 2005, however, appears to give KLCC, not Cayre personally, rights over the Dwek account as a secured party pursuant to a security agreement "dated even date herewith," not dated several weeks later. (Jenkins Decl. Ex. G.) KLCC acknowledges that the real estate transaction never took place, but claims that Dwek's failure to close on July 18, 2005 was a default event entitling KLCC to the assets in the Dwek account, yet KLCC took no action to obtain those assets until April 2006, after

the FBI and PNC Bank began proceedings against Dwek in New Jersey.

On October 3, 2005, Dwek opened a $10 million revolving line of credit with Amboy Bank (predecessors in interest to interpleader defendant D and D Trust).[FN2] As collateral for this loan, Dwek pledged what was identified in an October 12, 2005 UCC Financing Statement as an investment account held by Brown & Company in the name of Amboy bank worth $10 million. (See Sharpf Decl. Ex. A.) D and D claims that Dwek promised to fund this account with the assets held in his account at Citigroup, which is the account at issue in this case. (Scharpf Decl. ¶ 5.)

> FN2. Amboy Bank's interest was assigned to D and D Trust on May 31, 2006.

Some time in late January and early February, Dwek attempted to transfer his assets at Citigroup to Brown & Company to be held for Amboy Bank. On January 31, 2006, Citigroup received a letter on what appeared to be KLCC letterhead with what appeared to be Cayre's signature terminating KLCC's pledge agreement on the Dwek account. (Jenkins Decl. Ex. K.) KLCC claims that this letter was a forgery. On February 15, 2006, Dwek sent a letter directing Citigroup to transfer the assets to Brown & Company. (Jenkins Decl. Ex. J.) Amboy Bank was under the impression that this transfer would take several days, and that there may have been a previous pledge agreement on the assets, but that it had been released. (See D and D Mem. in Supp. of Mot. to Dismiss at 5.)

*2 On February 24, 2006, Citigroup received an email from Cayre's attorney stating that KLCC had not authorized any transfer of assets from the Dwek account and that any transfer would be in violation of the control agreement. (Jenkins Decl. Ex. L.) Citigroup terminated the transfer. Citigroup claims that it attempted to notify Amboy Bank that the transfer had been terminated, but was unsuccessful. Amboy Bank claims that it received no notice that the transfer was not completed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

On April 24-25, 2006, the FBI and PNC Bank initiated criminal and civil proceedings against Dwek in New Jersey state court for defrauding PNC Bank of $23 million dollars in an unfunded transfer.

On April 26, KLCC instructed Citigroup to liquidate the Dwek account and transfer all of the funds into a KLCC account at HSBC, (Jenkins Decl. Ex. H), but rescinded the order the next day. (*Id.* Ex. I.) Instead, KLCC directed Citigroup to transfer the assets to newly created account at Citigroup in KLCC's name. On May 1, 2006, at KLCC's direction, Citigroup began the process of transferring the assets now in KLCC's account at Citigroup to an account at Bear Stearns & Co.

On May 3, 2006, the Superior Court of New Jersey, Monmouth County in *PNC Bank v. Dwek*, No. MON-C-133-06 issued an order freezing all assets in which Dwek or Dwek-controlled entities had an interest. The order was published in the Asbury Press the following day, along with an article alleging that Cayre was the recipient of $2 million of the money that Dwek allegedly stole from PNC Bank.

On May 8, 2006, Amboy Bank contacted Citigroup about the status of the aborted February transfer and informed Citigroup that Amboy had an interest in the assets that had been in the Dwek account as collateral for a loan. In light of this claim and the potential that the assets were frozen by the New Jersey court order, Citigroup halted the transfer of the assets from the KLCC account to Bear Stearns.

Various claims by Dwek's creditors have been consolidated with the PNC Bank case in the New Jersey court before Judge Alexander Lehrer. Judge Lehrer appointed a fiscal agent to manage the frozen Dwek-owned properties. In an order dated November 1, 2006, Judge Lehrer appointed the person who had been merely a fiscal agent as the "Trustee in Liquidation," granting him all of the powers of a receiver in bankruptcy. (Citigroup's Supp'l Mem. at 2-4.) The Trustee in Liquidation was charged with marshalling and liquidating

Dwek's assets and distributing them to his creditors. (*Id.*)

Citigroup attempted to intervene in the New Jersey action by filing an order to show cause to interplead on June 1, 2006. When Citigroup learned that the court would not consider interpleader relief for at least 120 days, however, Citigroup withdrew the motion. Citigroup proposed bringing the matter to federal court by way of consent order which would provide for the joint management of the assets during the pendency of the action. On July 14, 2006, after the parties were unable to agree on a joint management plan, KLCC commenced an action in New York state court against Citigroup. It is unlikely that the New York court would be able to obtain personal jurisdiction over D and D Trust as it is a New Jersey trust and has no contacts with New York. Citigroup commenced a statutory interpleader action in this Court on July 17, 2006.

II

**\*3** We deal first with D and D Trust's motion to dismiss for lack of personal jurisdiction or to abstain in deference to parallel proceedings in New Jersey.

*A. Personal Jurisdiction*

As a threshold matter, D and D Trust argues that the case must be dismissed for lack of personal jurisdiction. D and D Trust claims that it is a citizen of New Jersey and does not have sufficient minimum contacts with New York to support the exercise of personal jurisdiction by a federal court sitting in New York.

This contention is meritless. Title 28 section 2361 of the United States Code allows nationwide service of process in statutory interpleader actions which, like the instant action, are brought under § 1335. 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1711 (3d ed.2001); see*State Farm Fire & Cas. Co.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

Page 4

*v. Tashire,* 386 U.S. 523, 529 n. 3 (1967). Therefore, even if it has no contacts with New York, this Court has personal jurisdiction over D and D Trust.

*B. Abstention in Deference to Parallel Proceedings*

D and D Trust next argues that the Court should abstain in deference to the consolidated Dwek action in New Jersey.

When faced with parallel proceedings in state court, the starting point for federal district courts, as the Supreme Court stated in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976), is the "virtually unflagging obligation ... to exercise the jurisdiction given them."*SeeRoyal & Sun Alliance Ins. Co. of Canada v. Century International Arms, Inc.,* 466 F.3d 88, 93 (2d Cir.2006). The task of the district court is not to find some reason *for* the exercise of federal jurisdiction, but rather to determine whether "exceptional circumstances" or the "clearest of justifications" exist to justify the surrender of that jurisdiction. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25-26 (1983); *see alsoColorado River,* 424 U.S. at 813 ("Abstention from the exercise of federal jurisdiction is the exception, not the rule.").

The Second Circuit has identified one discrete category of parallel proceedings that generally requires dismissal of the federal court action-bankruptcy proceedings. *SeeRoyal & Sun Alliance,* 466 F.3d at 92-93. A foreign jurisdiction's interest in "the equitable and orderly distribution of a debtor's property" which "requires assembling all claims against the limited assets in a single proceeding" is an interest "deserving of particular respect and deference."*Id.* at 93 (quoting *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713-14 (2d Cir.1987)). The district courts regularly defer to foreign bankruptcy proceedings. *SeeVictrix,* 825 F.2d at 713-15;*accord, e.g.,J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,* 412 F.3d 418, 424 (2d Cir.2005).

While the Second Circuit caselaw focuses primarily on deference to foreign bankruptcy proceedings, the policy justification does not differ with respect to parallel state court proceedings in the nature of bankruptcy. *Cf.Royal & Sun Alliance,* 466 F.3d at 93 (concluding that the test for abstention in deference to foreign and state court parallel proceedings is similar).

*4 The proceedings in the consolidated Dwek action in New Jersey appear to be in the nature of bankruptcy proceedings. The New Jersey court has frozen all of Dwek's assets and set up an expedited procedure for creditors to file claims on the assets. As of November 1, 2006, the court has appointed a Trustee in Liquidation charged with marshalling and liquidating the assets and distributing them to Dwek's creditors. The Trustee has all of the powers of a receiver in bankruptcy and is clearly engaged in the "equitable and orderly distribution" of Dwek's property. As such, the Dwek action should be treated as a parallel bankruptcy proceeding, to which a federal court would normally defer.

The Second Circuit has identified a limited exception to the general rule that federal courts should abstain in deference to parallel bankruptcy proceedings. In *Koreag, Controle et Revision S .A. v. RE-FCO F/X Associates, Inc.,* 961 F.2d 341, 349 (2d Cir.1992), the Second Circuit held that district courts should not defer to parallel bankruptcy proceedings when a party asserts a bona fide ownership interest in the property at issue. "Bona fide questions of property ownership ... are antecedent to the distributive rules of bankruptcy administration because they seek to determine whether an asset is actually part of the debtor's estate, rather than deciding the entitlement of certain creditors to pieces of that estate."*J .P. Morgan Chase Bank,* 412 F.3d at 426. A district court may decide a question of property ownership without interfering with the "equitable and orderly distribution of assets" in an ongoing parallel bankruptcy proceeding and therefore, under *Koreag,* should not abstain.

In this case, KLCC has asserted an ownership claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

to the assets in the Citigroup account, not a claim as a creditor. KLCC claims that it owns the assets outright, not that it has a mere security interest in assets owned by Dwek. KLCC claims that when the assets were transferred from the Dwek account to a KLCC account at Citigroup pursuant to the pledge and control agreements, its ownership interest was perfected. D and D Trust, on the other hand, claims that the assets are owned by Dwek and that it has a security interest in them that is superior to any interest that KLCC has. This raises a bona fide question of property ownership.[FN3]The issue before the Court is who owns the assets-KLCC or Dwek-and that issue is antecedent to any questions of equitable distribution in the New Jersey action.

> FN3. KLCC's ownership claim is not like the claim in *J.P. Morgan Chase Bank* where the Second Circuit held that the *Koreag* exception applies only to *bona fide* questions of property ownership. 412 F.3d at 427. In that case, J.P. Morgan acted as a facility agent for a consortium of lenders on a loan to Altos Hornos by establishing and managing a collection account into which the debtor would make payments and from which J.P. Morgan would distribute the funds to other consortium members. *Id.* at 419-21.After Altos Hornos filed for bankruptcy in Mexico, several of its customers mistakenly made payments directly into the collection account at J.P. Morgan which then claimed that it owned those assets because the account was in its name. *Id.* The Court held that J.P. Morgan had not raised a bona fide issue of property ownership because the assets in the account never belonged to the bank. Instead they were mistakenly paid by the debtor after filing bankruptcy and J.P. Morgan had a contractual obligation to use those funds to pay down the same debt that was the subject of the Mexican bankruptcy proceedings; it could not do with the money as it pleased. *Id.* at 427.Therefore, the district

court had properly abstained in deference to the Mexican bankruptcy proceedings.*Id.* KLCC, on the other hand, claims that the assets were transferred to it free and clear before the bankruptcy-like proceeding against Dwek in New Jersey began.

The type of exceptional circumstances that might justify abstention in favor of parallel state proceedings outside the bankruptcy context are not present in this case. In *Colorado River,* the Supreme Court laid out several factors that a court should consider in assessing whether the "clearest of justifications" for abstention exist. 424 U.S. at 819. They include: (1) the identity of the court that first assumed jurisdiction over the res, (2) the relative inconvenience of the federal forum, (3) the desirability of avoiding piecemeal litigation, (4) the order in which jurisdiction is obtained, (5) which sovereign's law will provide the rules of decision, and (6) the adequacy of state court proceedings to protect federal rights. *Id.* at 818;*Moses H. Cone,* 460 U.S. at 23-27. *Colorado River* did not lay out a "mechanical checklist" and none of these factors are determinative, but the balance is "heavily weighted in favor of the exercise of jurisdiction."*Moses H. Cone,* 460 U.S. at 16.

*5 An analysis of these factors in the instant case does not show any exceptional circumstances that would overcome the "virtually unflagging obligation" of the federal courts to exercise jurisdiction. Whether the alternative forum, New Jersey, has assumed jurisdiction over the property at issue in this case through its order freezing Dwek's assets depends on who owns the property-an issue that, as discussed above, is antecedent to the distributive rules of bankruptcy and properly decided in the federal forum. The mere fact that the property is physically present in Sea Girt, New Jersey does not mean that the New Jersey courts have assumed jurisdiction over it. The relative convenience of the state and federal forums cuts both ways. While it may be more convenient for D and D Trust to litigate in New Jersey, the Southern District of New

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

York is not too distant and the New Jersey court has made it clear that it would not begin to consider the issues in the interpleader action until at least 120 days after filing. The inconvenience in distance is offset by the convenience of expeditious proceedings. The avoidance of piecemeal litigation seems to be the strongest factor in favor of the New Jersey forum, but because the property ownership question is antecedent to the distributive questions in the New Jersey action, there is no risk of inconsistent judgments or interference with the equitable and orderly distribution of assets. The order in which jurisdiction was obtained, again, depends on the antecedent question of who owns the property: If Dwek owns it then New Jersey obtained jurisdiction first, but if KLCC owns it then New York was first to obtain jurisdiction. Assuming, without deciding, that New Jersey law would control, the issue of property ownership does not present a complex or unsettled issue of state law or involve important state policies such that abstention would be justified. Instead the Court would be asked to do what any federal court does when it sits in diversity: to apply state substantive law. Finally, there are no federal rights at stake. These are not the type of exceptional circumstances that would justify abstention under *Colorado River*.

Having determined that the case should not be dismissed for lack of personal jurisdiction, and that the Court should not abstain in deference to parallel proceedings in New Jersey without determining the antecedent issue of ownership, we turn now to the propriety of the interpleader action.

### III

An interpleader action is a useful tool for determining ownership of a discrete item of property in the possession of a disinterested stakeholder that is subject to multiple or competing claims. The action usually proceeds in two stages: First, the court determines whether the interpleader action is appropriate; second, the court determines the rights of the competing claimants to the fund. *Fidelity Broker-*

*age Services, LLC v. Bank of China*, 192 F.Supp.2d 173, 178 (S.D.N.Y.2002). The issue before the Court on Citigroup's motion is only the first stage. Citigroup argues that because it is a disinterested stakeholder and has brought a proper interpleader action, it is entitled to be discharged from liability for the property. KLCC argues that the interpleader action is not appropriate and should be dismissed because Citigroup did not reasonably fear multiple liability and Citigroup cannot be discharged because of KLCC's counterclaims alleging independent liability. D and D Trust has also represented that it has claims of independent liability against Citigroup, which it would assert in an answer if its motion to dismiss is denied.

### A. Propriety of the Interpleader Action

*6 To sustain a statutory interpleader action under § 1335, the stakeholder must be in possession of property worth $500 or more. 28 U.S.C. § 1335(a). The stakeholder must legitimately fear multiple liability or the vexatious conflicting claims to the same fund. *Fidelity Brokerage*, 192 F.Supp.2d at 178 (citing *Washington Elec. Co-op, Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir.1993)). There must be two or more adverse claimants of diverse citizenship as defined in § 1332. 28 U.S.C. § 1335(a). Finally, the stakeholder must deposit the property with the registry of the court or post a bond payable to the clerk of the court for the value of the property. *Id.*

Citigroup has clearly satisfied the first and third requirements for a valid interpleader action. It is in possession of property worth well in excess of $500 in which it claims no interest. The adverse claimants in this case satisfy the minimal diversity requirements because they are citizens of different states.[FN4]KLCC argues that Citigroup has failed to satisfy the second requirement, however, because it could not have reasonably feared multiple liability. KLCC claims that Citigroup did not adequately investigate the merits of D and D Trust's competing claim and that its claim to ownership of the prop-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

erty was so strong (and D and D's claim so weak) that Citigroup could not reasonably fear any exposure to double liability.

> FN4. KLCC is a limited liability company organized and existing under the laws of New York with its principal place of business in New York. D and D Trust is a trust organized and operating under the laws of New Jersey with its principal place of business in New Jersey.

Courts have consistently held that the fear of multiple claims and vexatious litigation are enough to sustain an interpleader action regardless of the merits of the competing claims. *E.g.,Fidelity Brokerage,* 192 F.Supp.2d at 178;*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente,* No. 98 Civ. 1756, 2001 WL 11070 at *5 (S.D.N.Y. Jan. 4, 2001). Wright, Miller, and Kane note that "it is immaterial whether the stakeholder believes that all the claims against the fund are meritorious. Indeed, in the usual case, at least one of the claims will be quite tenuous." 7 Wright, Miller & Kane, *supra* § 1704. "The stakeholder should not be obliged at its peril to determine which of two claimants has the better claim."*John Hancock Mutual Life Ins. Co. v. Kraft,* 200 F.2d 952, 954 (2d Cir.1953).

In this case, Citigroup has a reasonable fear of conflicting claims to the property giving rise to the vexation of multiple suits. KLCC claims an unencumbered ownership interest in the property and has already filed an action in New York state court to obtain the assets held in the Citigroup account. D and D Trust claims a security interest in the property (which it maintains is still owned by Dwek) and has made it clear that it will seek to recover the property from Citigroup either in this Court or in New Jersey. It was not incumbent on Citigroup to evaluate the merits of these competing claims or determine at its peril which claim was better. Citigroup had a legitimate fear that it would be subject to multiple conflicting suits seeking to recover the funds; this is the situation for which interpleader was designed.

*7 Citigroup has sought the Court's guidance in satisfying the final interpleader requirement of depositing the property with the registry of the court or posting a bond. Because of the volatile and unique nature of the property, Citigroup contends that liquidating it and paying the proceeds into the registry of the court would result in significant losses. Likewise, to avoid further reductions in value, the assets need active management. Citigroup contends that posting a bond for the value of the property, while it would avoid the problems associated with liquidating the property, would not provide for the active management of the property creating a risk of further loss in value. Although deposit of the property with the Court or the posting of a bond is considered a jurisdictional requirement for statutory interpleader under § 1335, *see, e.g.,Metal Transp. Corp. v. Pacific Ventures S.S. Corp.,* 288 F.2d 363, 365 (2d Cir.1961), interpleader is an equitable remedy that should be applied liberally, *seeState Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 533 (1967) and courts have substantial flexibility in its application. For example, courts regularly give a stakeholder an opportunity to comply with the deposit requirement before dismissing an interpleader action. *SeeLandmark Chemicals, S.A. v. Merrill Lynch & Co.,* 234 F.R.D. 62 (S.D.N.Y.2005); *American Smelting & Refining Co. v. Naviera Andes Peruana S .A.,* 182 F.Supp. 897, 898 (S.D.N.Y.1959); 7 Wright, Miller & Kane, *supra* § 1716.

Citigroup suggests that the property be held in the Court's name in an account at a broker-dealer and that the Court issue an order providing for the joint management of the property by KLCC and D and D Trust pending the outcome of this action. The parties have indicated that, prior to the commencement of this action, there was some discussion about joint management of the property to preserve its value pending an ultimate resolution of the issue of ownership. This discussion apparently broke down when Citigroup insisted on discharge as a condition of any agreement. In light of the fact that Citigroup claims no interest in the property, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

Page 8

that it appears to be in the interest of both compet-
ing claimants that the property be actively man-
aged, the parties are hereby given thirty days to
present the Court with a consent judgment dealing
solely with the issue of the form in which the prop-
erty should be deposited with the Court and how it
should be managed pending the final resolution of
the ownership claims. If the parties fail to reach an
agreement on this matter, the parties are each direc-
ted to submit a proposed order for how the property
should be managed and deposited with the Court
and the Court will adopt an order or direct Citig-
roup to post a bond. Citigroup will have ten days
from the date of entry of the Court's order dealing
with the management of the property to comply
with the order. The interpleader action will be sus-
tained as appropriate upon Citigroup's compliance.

*B. Citigroup's Motion for Discharge*

*8 Citigroup has moved the Court to be discharged
from the interpleader action because it has no claim
to any interest in the property. When a court de-
cides that an interpleader action is appropriate, it
may discharge a disinterested stakeholder from fur-
ther liability. 28 U.S.C. § 2361; *see* 7 Wright,
Miller & Kane, *supra* § 1714. Courts will not dis-
charge an interpleader stakeholder who is not disin-
terested-that is where the stakeholder has some
claim to the property at issue in the interpleader.
*SeeBankers Trust Co. of W. New York v. Crawford,*
559 F.Supp. 1359, 1365 (W.D.N.Y.1983).

Citigroup is not an interested stakeholder in the
sense that it claims some interest in the property
that is the subject of the interpleader; it claims
none. However, KLCC has asserted counterclaims
against Citigroup alleging independent grounds for
liability and D and D Trust has indicated that it will
do the same in its answer. KLCC's counterclaims
allege breach of contract, conversion, negligence,
and breach of covenant of good faith and fair deal-
ing.

The Court's approach in *Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Clemente,* No. 98 Civ.
1756, 2001 WL 11070 (S.D.N.Y. Jan. 4, 2001) is
instructive in this case. In *Merrill Lynch,* the stake-
holder had met the requirements for a valid inter-
pleader action and claimed no interest in the funds
at issue, however one of the claimants made a
counterclaim alleging an independent basis for liab-
ility based on breach of contract and conversion.*Id.*
at *5-7.The Court sustained the interpleader and
discharged the stakeholder from liability for the
funds deposited with the Court, but did not dismiss
the stakeholder from the case. *Id.* at *7. Instead, the
Court denied cross motions for summary judgment
on the counterclaim and held that it would revisit
the breach of contract and conversion claims after
the second stage of the interpleader if the funds
were found to belong to that claimant. *Id.* The
Second Circuit has sanctioned such a "three stage"
approach in *Royal School Laboratories, Inc. v.
Town of Watertown,* 358 F.2d 813, 817 (2d
Cir.1966) in which Judge Friendly held that the dis-
trict court should first resolve which claimant was
entitled to the funds in the second stage of inter-
pleader and then, if necessary, turn to a claimant's
counterclaim in tort.

Like the stakeholder in *Merrill Lynch,* Citigroup
has no claim to any interest in the property, but
faces counterclaims alleging independent liability
to the claimants. Because the Court has determined
that interpleader is appropriate in this case and be-
cause Citigroup is a disinterested stakeholder, Cit-
igroup is discharged from further liability for the
property held in the KLCC account on the condition
that it deposits the property with the Court in ac-
cordance with a consent judgment submitted by the
parties or other order of the Court. Citigroup is not,
however, dismissed from the case. The Court will
consider KLCC's counterclaims and any counter-
claims that D and D Trust asserts in its answer after
the issue of ownership of the property is resolved.

III

*9 KLCC moved for partial summary judgment dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 9
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
(Cite as: 2007 WL 102128 (S.D.N.Y.))

missing the interpleader complaint and granting in-
junctive relief on its sixth counterclaim directing
Citigroup to transfer the property to a KLCC ac-
count at Bear Stearns & Co., as previously instruc-
ted. As discussed above, interpleader is appropriate
in this case and is sustained on the condition that
Citigroup comply with the requirement to deposit
the property with the Court. Therefore KLCC's mo-
tion for summary judgment dismissing the inter-
pleader complaint is denied.

KLCC's motion for summary judgment on its coun-
terclaim for an injunction directing Citigroup to
transfer the property to a KLCC account at Bear
Stearns is premature. To date, the parties have not
conducted any significant discovery and D and D
Trust has yet to file an answer. The Court is reluct-
ant to grant summary judgment on such a limited
record. Only in the rarest of cases should summary
judgment be granted against a party who has not
had the opportunity to conduct discovery. *Hell-
strom v. U.S. Dept. of Veteran Affairs,* 201 F.3d 94,
97 (2d Cir.2000); *see*Fed.R.Civ.P. 56(c), (f). Ac-
cordingly, KLCC's motion for summary judgment
on its counterclaim is denied without prejudice.

IV

For the reasons stated above: D and D Trust's mo-
tion to dismiss for lack of personal jurisdiction or
abstention in deference to the proceedings in New
Jersey is denied. D and D Trust is directed to file an
answer within the time period allotted by the Feder-
al Rules of Civil Procedure.

Citigroup's interpleader action is sustained and Cit-
igroup is discharged from further liability for the
assets in the KLCC account conditioned on Citig-
roup satisfying the fourth requirement for statutory
interpleader by depositing the assets with the Court
or posting a bond. Within thirty days, the parties
are directed to either: (1) jointly submit a consent
judgment specifying in what form the assets should
be deposited with the registry of the court and how
the assets should be managed pending resolution of

the ownership issue, or (2) each submit a proposed
order specifying in what form the assets should be
deposited with the registry of the court and how the
assets should be managed pending resolution of the
ownership issue or, in the alternative, stating that
Citigroup should post a bond. Citigroup shall then
have ten days from the entry of the consent judg-
ment or order to comply, at which point the inter-
pleader will be sustained and Citigroup will be dis-
charged. If Citigroup fails to comply, the inter-
pleader will be dismissed.

Pursuant to 28 U.S.C. § 2361, KLCC's action
against Citigroup in New York state court, encap-
tioned *KLCC Investments, Inc. v. Smith Barney, a
division of Citigroup Global Markets, Inc.,* Index
No. 602505/06, is stayed pending further order of
this Court. The parties are enjoined from instituting
or prosecuting any other actions in any other court
affecting the property at issue in this interpleader
action.

KLCC's motion for summary judgment is denied
without prejudice.

**\*10** Within ten days from the date that Citigroup
complies with the judgment or order regarding the
deposit of the assets with the Court, the parties are
directed to submit a proposed schedule for discov-
ery on the issue of ownership and submission of a
pretrial order.

Citigroup is not dismissed from the case. The Court
will consider any counterclaims against Citigroup
after resolution of the ownership issue. At that time
the Court will also entertain any motions that, in
light of the resolution of the ownership issue, the
Court should abstain in deference to proceedings in
New Jersey or New York state court.

SO ORDERED.

S.D.N.Y.,2007.
Citigroup Global Markets, Inc. v. KLCC Invest-
ments, LLC
Slip Copy, 2007 WL 102128 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 102128 (S.D.N.Y.)
**(Cite as: 2007 WL 102128 (S.D.N.Y.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.